**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| REEAH ROBINSON, *on behalf of* M.H., <br><br> Plaintiff, <br><br> vs. <br><br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | CASE NO. 1:22-cv-00474 <br><br> MAGISTRATE JUDGE AMANDA M. KNAPP <br><br> <u>**MEMORANDUM OPINION AND ORDER**</u> |

Plaintiff Reeah Robinson ("Plaintiff" or "Ms. Robinson") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") on behalf of her minor child, M.H. (ECF Doc. 1, ECF Doc. 10, ECF Doc. 12.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 8.)  For the reasons set forth below, the Court **AFFIRMS** the final decision of the Commissioner.

## I. Procedural History

On November 27, 2019, Ms. Robinson filed an application for children's SSI on behalf of her child M.H. with an alleged disability onset date of January 31, 2012.  (Tr. 17, 150-57.)  She alleged M.H. was disabled due to severe ADHD, oppositional disorder, and dyslexia.  (Tr. 73, 81, 91, 99.)  The application was denied at the initial level (Tr. 87-91) and upon reconsideration (Tr. 97-99), and a hearing was requested (Tr. 100-03).  A hearing was held on March 3, 2021 before an Administrative Law Judge ("ALJ").  (Tr. 54-71.)

1

The ALJ issued a decision on April 21, 2021, finding M.H. was not under a disability within the meaning of the Social Security Act since November 27, 2019, the date the application was filed.  (Tr. 14-31.)  The Appeals Council denied Ms. Robinson's request for review on February 28, 2022, making the ALJ decision the final decision of the Commissioner.  (Tr. 1-7.)  The case has been fully briefed and is ready for review.  (ECF Docs. 10, 11, 12.)

## II.     Evidence

### A.     Personal Evidence

M.H. was born in 2009.  (Tr. 18.)  Under Social Security regulations, he was a school-age child at the time of the application and the ALJ's decision.  (*Id*.)

### B.     Medical and Educational Evidence

#### 1.     Educational and Treatment Records

M.H. presented to Family Behavioral Health Services for an evaluation with Tammy L. Cappadonna-Kloss, LPC, on January 17, 2018.  (Tr. 229, 235-37.)  His presenting problem was ADHD; it was reported that his attention was continually interrupted, and he had problems sitting still and focusing.  (Tr. 236.)  Ms. Robinson also reported that M.H. struggled in school and had a hard time with reading and writing, and that his teacher said he did not listen and was not focused in class.  (*Id*.)  M.H. had difficulty concentrating on examination, but his eye contact, speech, and appearance were normal.  (*Id*.)  His affect and thoughts were appropriate, and his thoughts were logical.  (*Id*.)  He was open, cooperative, and polite.  (*Id*.)  Ms. Cappadonna-Kloss recommended cognitive-behavioral therapy and listening skills.  (Tr. 237.)

M.H. returned for therapy with Ms. Cappadonna-Kloss on January 24, 2018.  (Tr. 238.)  He reported that he had gotten into trouble at school that week for not listening and being out of his seat.  (*Id*.)  He had a hard time sitting still during the appointment.  (*Id*.)  He could describe

2

his math homework, but could not otherwise remember what he learned that week. (*Id.*) Ms. Cappadonna-Kloss played cards with M.H. so she could evaluate his ability to identify numbers, letters, and directives. (*Id.*) She noted that he struggled matching colors and numbers at times, but she felt he generally did okay. (*Id.*) She also had him read from a book. (*Id.*) He exhibited low-average reading skills, but did not appear frustrated or angry with not knowing, not learning, or not being able to focus. (*Id.*) Instead, he exhibited an "'I don't care' attitude." (*Id.*) He was polite and considerate, and listened when asked questions. (*Id.*) M.H. did not attend any additional counseling sessions at Family Behavioral Health Services. (Tr. 240.)

M.H. presented for a routine well visit with Shivani Joshi, M.D., at University Hospitals on November 27, 2018. (Tr. 267-72.) It was reported that he had been without his ADHD medication since May 2018. (Tr. 267.) He did not have an IEP in place, but did have 504 plan accommodations. (*Id.*) Dr. Joshi diagnosed ADHD. (Tr. 272.) He reminded Ms. Robinson that she had to call every month for M.H.'s prescription, and that M.H. had to be seen every six months to continue receiving a prescription for ADHD medication. (*Id.*)

M.H. returned to Dr. Joshi on February 5, 2019, for a follow up regarding his ADHD. (Tr. 264-66.) Ms. Robinson reported that M.H. had done well on the prescribed dosage of 20 mg for the first few weeks, but it had started to wear off. (Tr. 264.) She said M.H.'s teacher called the prior week, saying M.H. had been "all over the place" and was "refusing to do his work." (*Id.*) Dr. Joshi continued M.H. on 20 mg, but advised Ms. Robinson to call the following month if he was still having trouble so they could increase his medication to 30 mg. (Tr. 266.)

The record does not reflect further treatment for ADHD until October 16, 2019, when M.H. presented to Bellefaire JCB. (Tr. 253-54, 281-98.) Ms. Robinson was seeking services from Bellefaire's after-school program, which she had learned about from a friend. (Tr. 253.)

3

She reported that M.H. had problems focusing and paying attention, and was easily frustrated, hyperactive, and impulsive. (*Id*.) She also reported that he was a follower at school and had poor peer relationships. (*Id*.) She said he repeated third grade due to difficulty completing his schoolwork. (*Id*.) He also reportedly had difficulty with family members due to frequent lying and not taking ownership of his behaviors. (*Id*.)

M.H. underwent a psychiatric diagnostic evaluation with Robert Lieberman, LISW-S, on October 16, 2019. (Tr. 281-90.) On examination, he demonstrated decreased impulse control and frustration tolerance and impaired judgement and interpersonal boundaries, but otherwise unremarkable findings. (Tr. 286-87.) Mr. Lieberman recommended that M.H. participate in day treatment services with the after-school program three to five days per week. (Tr. 289.) He was scheduled to begin TBS group services on October 29, 2019. (Tr. 253.)

On October 28, 2019, M.H. attended a routine health visit with Corine Doho, APRN-CNP, at University Hospitals. (Tr. 259-63.) His development was age appropriate, but his social interactions were not age appropriate, his school behaviors were not within normal limits, his school performance was not at grade level, and he was not well-adjusted to school. (Tr. 259.) Ms. Robinson reported that his grades and behavior were bad, and he was repeating the third grade; she was concerned about a learning disability or dyslexia. (*Id.*) Despite prior recommendations, M.H. was not receiving counseling and did not have an IEP. (*Id.*) However, he was starting the Bellfaire after-school program that day, two days per week. (*Id.*) M.H. was taking 30 mg of Adderall daily without side effects. (*Id.*) On examination, his mood and affect were normal. (Tr. 261.) CNP Doho noted the following diagnoses or problems: ADHD, oppositional behavior, conduct disorder, and learning difficulty involving reading. (Tr. 262.) She also noted that he was taking his ADHD medication every morning with food, but still had

behavioral concerns at home and at school.  (*Id.*)  Although Ms. Robinson had not established an

IEP at school, she planned to have a parent teacher conference.  (*Id.*)  CNP Doho referred M.H.

to rainbow care connection for further evaluation and treatment given Ms. Robinson's concerns

regarding a possible learning disability or dyslexia.  (*Id.*)  His medications were continued.  (*Id.*)

M.H. attended an interim update of his psychiatric diagnostic evaluation with Sarah E.

Oliver, LISW-S, and Robyn Skolnik, MA, PC, at Bellefaire on November 25, 2019.  (Tr. 291-

92.)  Ms. Robinson reported frequent phone calls home due to M.H. not listening at school and

on the bus, and disruptive conduct in the classroom that included being out of his seat and not

completing his work.  (Tr. 291.)  She wondered whether having to repeat the third grade was

influencing his negative behaviors.  (*Id.*)  Additional services were added, and M.H. was

scheduled to begin individual psychotherapy, individual therapeutic behavioral services ("TBS")

and community psychiatric support treatment ("CPST") on January 14, 2020.  (Tr. 291, 293,

299.)  M.H. attended TBS with Ms. Skolnik on November 25, 2019.  (Tr. 299.)

The record contains a "parent invitation" from school psychologist Ms. Zahler to Ms.

Robinson dated December 4, 2019.  (Tr. 274.)  The invitation indicates that a meeting was

scheduled for December 13, 2019, at Ms. Robinson's request, to discuss whether M.H. had a

disability and possible testing for an IEP.  (*Id.*)

M.H. attended two group therapy sessions at Bellefaire in January 2020. (Tr. 321-22,

323-26.)  He was restless and showed a lack of interest several times during the January 24 group

session.  (Tr. 322.)  He was engaged during the January 28 group session but needed redirection

on multiple occasions and struggled with following group rules.  (Tr. 326.)  M.H. also attended

two individual psychotherapy sessions (Tr. 301-06), and two TBS sessions (Tr. 314, 315) with

Melissa Newport, LSW, at Bellefaire in January 2020.  The sessions were conducted at school.

(Tr. 300-06, 314-15.)  Ms. Newport worked with M.H. on making better choices, demonstrating appropriate behaviors, and understanding feelings.  (Tr. 302, 305.)  She also worked with M.H.'s teacher on ways to address concerns regarding his inappropriate use of the internet in the classroom.  (Tr. 314.)  Ms. Newport noted on January 23 that M.H. kept falling asleep while taking the test to move to the fourth grade.  (Tr. 315.)  Although Ms. Newport kept prompting M.H. to stay awake and encouraged him to stand up and stretch to stay awake, he failed to take the test seriously.  (*Id*.)

M.H. continued to attend therapy with Ms. Newport in February 2020.  (Tr. 307-13, 316-20.)  She worked with him on understanding and processing feelings, potential consequences for inappropriate behavior, and ways to stay focused and on task while in the classroom.  (Tr. 309, 313, 316, 318.)  She also worked with M.H.'s teachers on ways to address inappropriate classroom behavior.  (Tr. 316.)  On February 12, Ms. Newport noted M.H. was focused and engaged, but that his teacher said he was never on task and asked Ms. Newport to sit with him all the time to keep him focused.  (Tr. 318.)  Ms. Newport indicated she would work with him to learn ways to stay on task, be focused, and be engaged even when she was not present; she noted that M.H. responded and listened well to her.  (*Id*.)  On February 18, Ms. Newport noted that M.H. had been called to the principal's office for watching inappropriate material on the internet at school for a second time.  (Tr. 320.)  She worked with M.H. to think about his actions and ways to prevent similar incidents in the future.  (*Id*.)

M.H. presented for a telehealth visit with CNP Doho on May 21, 2020.  (Tr. 349-51.)  He reported doing well with no complaints.  (Tr. 349.)  He was "[p]assing everything" and hoped to move on to the fourth grade if he did not fail testing.  (*Id*.)  He was going to Bellefaire every day.

(*Id*.)  He was having no trouble eating or sleeping, was very active, and played basketball.  (*Id*.)
CNP Doho recommended that he continue his current medications.  (*Id*.)

M.H. continued treatment at Bellefaire from August 2020 through early 2021.  (Tr. 357-
627.)  He had a Psychiatric Diagnostic Evaluation Annual Update on September 16, 2020.  (Tr.
357-59.)  He had shown significant improvement in his impulse control as demonstrated by
staying in his seat during group sessions when expected, rarely throwing things across the room
as he did at first, and improved interactions with peers.  (Tr. 357.)  However, he could still
improve in his impulse control, social appropriateness in his interactions with peers, focus and
staying on task, and asking for things before taking them.  (*Id*.)  He continued to meet the criteria
for attention-deficit disorder, combined presentation due to: difficulty paying attention and
completing schoolwork; being forgetful, easily distracted, and unorganized; not following
through on instructions to complete new work; failing to pay close attention to detail; and
struggling with listening, staying on task, and hyperactivity.  (Tr. 358.)

M.H. struggled on occasion with staying on task during after-school group sessions; he
also struggled with following directions, managing his emotions, participating during an
interview activity, needing redirection, and talking negatively during group activity.  (*See e.g.*,
Tr. 415, 427, 433, 435, 492, 518, 526, 567, 574, 578.)  However, he usually participated readily
with few redirections and interacted appropriately with peers and staff during group after-school
sessions from August 2020 through February 2021.  (Tr. 412-528, 531-32, 534-42, 544-57, 559-
64, 566-71, 573-84, 586-99.)

M.H. attended individual teletherapy sessions with Shannon Gardner, LSW, from
September 2020 through January 2021.  (Tr. 604-12, 616-27.)  On September 29, Ms. Gardner
spoke with Ms. Robinson to introduce herself as a new provider, establish a weekly meeting

7

time, and discuss a treatment plan.  (Tr. 603.)  At a teletherapy session on October 1, M.H.

practiced good listening skills and worked on deep breathing exercises as a mindfulness

technique.  (Tr. 605.)  On October 8, he reported feeling calmer and happier after using breathing

exercises.  (Tr. 607.)  M.H. missed some sessions with Ms. Gardner in November 2020 due to

reported technological issues with video visits.  (Tr. 613-14.)  Ms. Gardner continued to work

with M.H. on listening and coping skills.  (Tr. 617, 619.)  She also worked with him on

developing coping skills to manage difficult emotions, including those related to his aunt passing

away in December.  (Tr. 621, 625.)  Ms. Gardner noted on January 22 that M.H. was continuing

to develop social and coping skills to help him make positive decisions.  (Tr. 627.)

M.H. attended a well-child visit with CNP Doho at University Hospitals on January 11,

2021.  (Tr. 342-47.)  Ms. Robinson reported that M.H. still did not have an IEP and might have

to repeat fourth grade.  (Tr. 343.)  They discussed the need for Ms. Robinson to speak with a

counselor and the principal about getting an IEP for M.H., and to speak with a counselor about

reassessing goals because M.H.'s impulsivity was getting worse.  (*Id.*)  M.H.'s mood and affect

were normal on examination.  (Tr. 347.)  M.H.'s ADHD medications were refilled.  (Tr. 343.)

M.H.'s 2020-2021 report card for the second quarter of fourth grade showed Fs in

mathematics, English language arts, science, and social studies. (Tr. 221.)  Under the "comment"

section, it was noted that M.H. had missing assignments in English language arts, science, and

social studies, and needed to practice his multiplication facts daily.  (*Id.*)  It was also noted under

"Work Habits" that M.H. did not attend class or complete assignments.  (*Id.*)

2.      **Opinion Evidence**

i.      **State Agency Psychological Consultants**

State agency psychological consultant Mary Hill, Ph.D., reviewed the record on July 27, 2020.  (Tr. 73-79.)  Dr. Hill opined that M.H. had severe impairments of borderline intellectual functioning, attention deficit / hyperactivity disorder, and oppositional defiant disorder.  (Tr. 76.) Dr. Hill also opined that M.H. had no limitation in the domains of moving about and manipulating and health and physical well-being; less than marked limitations in the domains of acquiring and using information, interacting and relating with others, and caring for yourself; and a marked limitation in the domain of attending and completing tasks.  (Tr. 76-77.)

State agency psychological consultant Juliette Savitscus, Ph.D., reviewed the record on reconsideration on October 17, 2020.  (Tr. 81-86.)  She affirmed Dr. Hill's opinions.  (Tr. 83-84.)

ii.      **Consultative Examiners**

a.    **Clinical Psychologist Michael Faust, Ph.D.**

M.H. presented to Michael Faust, Ph.D., on March 14, 2018, for a psychological consultative examination.  (Tr. 243-49.)  Ms. Robinson told Dr. Faust she felt her son was disabled due to ADHD.  (Tr. 243.)  She reported that he was taking Adderall with limited improvement; he was still distracted, disruptive, and talked during class.  (Tr. 244.)  She reported that he was able to focus a little more—"for a longer, but still short, time"—since starting Adderall and had "been able to get some tasks done while on meds."  (Tr. 245.)  He took his medication at the evaluation because he had not taken it prior to his appointment.  (Tr. 245-46.)

Ms. Robinson reported that M.H. was in second grade general education classes, but with a 504 Plan.  (Tr. 244.)  He did not have an IEP, but she was trying to get him one.  (*Id*.)  She said M.H. was forgetful and disorganized, had a history of walking out of class; he did his homework

but did not turn it in.  (*Id.*)  She reported that he had a history of fighting with his siblings and other children at school, but explained: "He's not aggressive.  He'll pick with people - not bully - just annoys." (Tr. 245.)  She also reported that he was caught stealing from a school store.  (*Id.*)  She said he could shower and dress himself and pick out his own clothes. (Tr. 247.)  She also indicated that he had chores to do, but had a short attention span and got upset when she told him to do something.  (*Id.*)  Although she reported that he did not have friends, she also indicated he did have friends at school.  (*Id.*)  She explained that he had some difficulty making and keeping friends because he did not understand boundaries, picked on others, and annoyed and agitated others.  (*Id.*)  He liked sports, drawing, and playing with Legos and cars.  (*Id.*)

On examination, M.H. was pleasant, cooperative, and friendly.  (Tr. 245.)  He fidgeted and showed signs of hyperactivity but was easily redirected.  (*Id.*)  His thinking was goal-directed, and he showed no difficulty understanding simple or complex directions.  (Tr. 246.)  There were no signs of anxiety or depression, but he was distracted, impulsive, and fidgety.  (*Id.*)  He was talkative with generally age-appropriate responses.  (*Id.*)  His "fairly articulate speech and ability to understand all instructions" suggested an overall IQ level consistent with the low average range.  (*Id.*)  He was oriented on all spheres and knew his age, date of birth, the month and year, and the President of the U.S.  (*Id.*)  He repeated 4 digits forward and 2 digits backward and was able to explain that a butterfly and a bee are alike because they are insects.  (*Id.*)

Wechsler Intelligence Scale for Children-V ("WISC-V") testing was conducted, reflecting a full-scale I.Q. of 74. (Tr. 247.)  Subtest scores included: 89 in verbal comprehension; 86 in visual spatial; 76 in fluid reasoning; 79 in working memory; and 77 in processing speed. (*Id.*)  Dr. Faust observed that M.H. "put forth variable effort on testing tasks due to his attention," and his test performance was mildly lower than expected.  (Tr. 248.)  He tested within

the borderline range of intellectual ability, but Dr. Faust estimated that he was functioning within the low average range of intellectual capacity. (*Id*.)  Intra-subtest analysis revealed a significant strength in vocabulary, which measured fund of word knowledge, and a significant weakness in coding, which measured speed and accuracy of visual motor coordination, attention to detail, and the ability to sustain attention to a self-directed, visual task.  (*Id*.)

Dr. Faust diagnosed M.H. with ADHD and noted that he demonstrated outward signs of attention deficits, including inattention, distractibility, impulsivity, and hyperactivity.  (Tr. 248.)

As to "acquiring and using information," Dr. Faust opined that M.H. "understood simple or one-step instructions and understood complex or multi-step instructions," but would "likely h[ave] difficulty learning and retaining new information . . . due to his ADHD symptoms" because he was "distracted by his surroundings."  (Tr. 248.)  He opined that M.H. would need "more redirection to sustain focus to the task and given small segments of information to be able to cognitively process and learn didactic information due to ADHD symptoms."  (*Id*.)  He further opined that M.H. was "struggling with learning in the classroom related to his attention deficits and associated disruptive behaviors" even though he was "estimated to be functioning within the low average range with no diagnosable intellectual learning disorders."  (Tr. 248-49.)

As to "attending to and completing tasks," Dr. Faust opined that M.H. would "have difficulty sustaining attention for prolonged periods of time and [would] require redirection from adults in a group setting to complete assigned tasks."  (Tr. 249.)  M.H. would "likely interrupt peers and be disruptive in a group situation as he [wa]s impulsive and hyperactive."  (*Id*.)

As to "interacting and relating to others," Dr. Faust opined that M.H. was "reported to have limitations in his ability to interact due to disruptive and inattentive behavior, but [had] no

difficulty with oppositional or defiant attitudes." (Tr. 249.) As to self-care, Dr. Faust opined M.H. could manage his self-care activities with structure and reminders from his mother. (*Id*.)

### b. Psychologist J. Joseph Konieczny, Ph.D.

M.H. presented to J. Joseph Konieczny, Ph.D., for a second consultative psychological evaluation on July 22, 2020. (Tr. 328-31.) M.H. was ten years old at the time. (Tr. 328.) He was most recently in the third grade. (Tr. 329.) Ms. Robinson reported that his grades were unsatisfactory, and he had some disciplinary problems at school. (*Id*.)

Ms. Robinson reported that M.H. was diagnosed with ADHD at age seven and was on ADHD medication. (Tr. 328.) She said he was hyperactive, restless, and had poor concentration and attention to tasks when he was not on his medication; he was also very oppositional, defiant, and aggressive. (*Id*.) Ms. Robinson said his medication helped alleviate his symptoms to some degree. (*Id*.) He had not taken his medication that day but took it the day before. (*Id*.) She described his disability as "ADHD and his temper and his attention span." (Tr. 329.)

Dr. Konieczny observed that M.H. separated easily from his mother but exhibited some psychomotor agitation. (Tr. 329.) He was generally pleasant but was also restless and paced around the room during the interview portion of the evaluation. (*Id*.) He responded readily to questions regarding school and other interests and his level of speech appeared to be adequate for an individual of his age. (*Id*.) However, he showed a diminished tolerance for frustration and made minimal effort during testing, giving some responses that were "quite random" and appearing to "intentionally offer wrong answers to questions." (*Id*.)

A WISC-V test was conducted, with results reflecting a full-scale I.Q. score of 45. (Tr. 329-30.) Dr. Konieczny noted that M.H.'s effort during testing was suspect because he appeared to intentionally offer wrong answers to questions, answered impulsively and randomly at times,

and could not answer simple questions that one would expect an individual of his age to be able to answer.  (*Id*.)  Dr. Konieczny opined that "it [was] likely that the current test results [were] not valid" given M.H.'s "minimal effort during the current testing."  (Tr. 330.)  Examination findings reflected that M.H.'s level of speech was "significantly greater than anticipated given the results of the intellectual testing."  (Tr. 329.)  Dr. Konieczny opined "[b]ased on the results of the previous intellectual testing" that M.H.'s "true level of intellectual functioning [was] likely to lie more in the borderline range."  (Tr. 330.)

Dr. Konieczny diagnosed: borderline intellectual functioning; ADHD, predominately hyperactive-impulse type; and other specified destructive behavior disorder. (*Id*.)  He opined that M.H. would have "limitations" in his ability to interact and relate to others and "some limitations" in his abilities to acquire and utilize information and to attend and complete tasks. (*Id*.)  He also opined that M.H.'s "diminished tolerance for frustration and coping skills . . . would impact his capabilities" in some self-care areas.  (*Id*.)

### iii.   LSW Shannon Gardner

Ms. Gardner completed a Mental Residual Functional Capacity Assessment ("Mental RFC Assessment") on February 19, 2021.  (Tr. 628-30.)  Ms. Gardner was one of M.H.'s Bellefaire counselors (Tr. 603) and identified herself on the assessment as a school-based therapist (Tr. 628). The Mental RFC Assessment prompted Ms. Gardner to rate M.H.'s ability to sustain activities over a normal workday and work week on an ongoing basis.  (Tr. 629-30.)

Ms. Gardner reported that M.H. was diagnosed with attention deficit hyperactivity disorder. (Tr. 628.)  She stated that he attended group therapy three to five times each week and met with a school-based counselor on an individual basis three to four times each month.  (*Id*.)  She reported that M.H. was able to use coping skills to remain on task at school and home, but needed frequent redirection to sustain attention.  (*Id*.)

13

Ms. Gardner opined that M.H.'s symptoms were severe enough to interfere with the attention and concentration necessary to perform simple tasks 15-20% of the time. (Tr. 628.) She opined that he was "not significantly limited" in his ability to: remember locations and work-like procedures; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors. (Tr. 629.) He was "moderately limited" in his ability to: understand and remember very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (Tr. 629-30.) He was "markedly limited" in his ability to: carry out very short and simple instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; and complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 629.) She opined that M.H.'s symptoms impacted his academic performance, but he continued to learn coping skills in treatment. (Tr. 630.)

## C.    Hearing Testimony

Ms. Robinson testified at the March 3, 2021, hearing. (Tr. 60-71.) She said M.H. was eleven years old and in fourth grade. (Tr. 60.) He was attending school virtually full-time. (Tr. 60-61.) He was also meeting with his individual counselor virtually once a week and attending group counseling in person at Bellfaire four days per week, from 3:00 p.m. to 6:30 p.m. (Tr. 61, 67.) She reported that M.H.'s counselor told her M.H. was often distracting and distracted while in group counseling. (Tr. 67-68.)

14

Ms. Robinson explained that M.H. was easily distracted and had a limited attention span due to ADHD.  (Tr. 61.)  She reported that he lied, teased, and picked on his siblings, and was disobedient.  (Tr. 61-62.)  She said that it was hard for him to calm down if he was upset, he was impulsive, and he destroyed things when he was angry.  (Tr. 61.)  She also said M.H. could not remember doing things and could not follow regular or normal daily routines, like waking up, brushing his teeth, or washing his face.  (Tr. 61-62.)  She said that M.H. "disappeared from home" three times when he was younger, but reported not remembering that happening.  (Tr. 61.)  She explained that it was hard for M.H. to fall asleep, and he would stay up for hours at night and not be able to wake up in the morning for school.  (Tr. 62.)  She had recently started to give M.H. melatonin to help him fall asleep.  (Tr. 62-63.)  It was not prescribed by a physician, but she said it helped him fall asleep sooner on some days.  (*Id.*)

Ms. Robinson also testified about M.H.'s behavior at home, explaining that he aggravated his three brothers by getting in their faces, took things from them, and broke their things.  (Tr. 63, 68.)  She said M.H. was vindictive and did things to get back at his brothers if they did something that bothered him.  (Tr. 63, 68-69.)  She reported that she had to redirect or remind him to stay focused on tasks and to do his chores at home.  (Tr. 66-67.)

Ms. Robinson reported that M.H. took Adderall for his ADHD, and it worked about fifty percent of the time.  (Tr. 63-64.)  Some days she noticed a big difference, like he might sit calmly or get up and do something when she asked him to.  (Tr. 64.)  Other times, she said the medication did not seem to work at all.  (*Id.*)  She acknowledged that she did not always give M.H. his medication on the weekends because she tried "to save [it] for when he[] [was] in school so . . . he could pay attention."  (*Id.*)

Ms. Robinson testified that she had to sit with M.H. while he was participating in his virtual classes and redirect him constantly to pay attention to his teacher.  (Tr. 65, 66.)  He was not organized and did not prepare himself for his classes each day.  (Tr. 69.)  Some days he hid the charger for his tablet to avoid having to do work.  (*Id*.)  He misplaced books and other school supplies.  (*Id*.)  She did not know if he was hiding his school materials or throwing them away, and he usually blamed someone else for not having his materials or not having his tablet charged.  (*Id*.)  She said he did not always complete his assignments and his teacher would contact her to tell her he needed to log in and complete them.  (Tr. 65.)  He was "failing like really, really bad."  (*Id*.)  She reported that he had a 504 plan and she was trying to get him an IEP.  (*Id*.)  They had gone for IEP testing the day of the hearing.  (*Id*.)

Ms. Robinson was trying to avoid having M.H. retained again because he was almost twelve years old and in fourth grade; he had already repeated third grade.  (*Id*.)  They told her they could not keep holding him back in third grade because of his age, but she was concerned he was not learning what he needed to, so she was "pushing . . . hard for the IEP."  (Tr. 65, 70.)  She said M.H. was reading at a first-grade level.  (Tr. 65-66.)  She worked with him on reading, but he struggled with kindergarten and first-grade level books.  (Tr. 66.)  She encouraged M.H. to read his own school assignments, but typically ended up having to read the instructions to him because he struggled.  (*Id*.)  She did not know if he comprehended or understood things or if he had a learning disability in addition to his ADHD.  (Tr. 70.)  She expressed concern and worry because he was getting older but she did not see him progressing.  (*Id*.)

### III.    Standard for Disability

To qualify for SSI benefits, "[a]n individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which

results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). To qualify, a child recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

Social Security regulations prescribe a three-step sequential process to evaluate children's disability claims. 20 C.F.R. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To make the step three determination that a child "meets" a listing, the child's impairment must be substantiated by medical findings shown or described in the listing for that impairment. 20 C.F.R. § 416.925(d). Alternately, to make a step three determination that a child "medically equals" a listing, the child's impairment must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that impairment. 20 C.F.R. § 416.926(a). Finally, to make a step three determination that a child "functionally equals" a listing, the impairment must be found to be "of listing-level severity," meaning that it will "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a).

## IV.     The ALJ's Decision

The ALJ made the following findings in his April 21, 2021 decision:[1]

1. The claimant was born in 2009. Therefore, he was a school-age child on November 27, 2019, the date application was filed, and is currently a

---

[1] The ALJ's findings are summarized.

school-age child. (Tr. 18.)

2. The claimant has not engaged in substantial gainful activity since November 27, 2019, the application date. (*Id.*)

3. The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD), and borderline intellectual functioning (BIF). (*Id.*)

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 18-20.)

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings. (Tr. 20-26.)

6. The claimant has not been disabled, as defined in the Social Security Act, since November 27, 2019, the date the application was filed. (Tr. 26.)

## V. Plaintiff's Argument

Ms. Robinson argues that the ALJ erred when he found that M.H.'s impairments did not functionally equal a listed impairment because the evidence shows M.H.'s impairments resulted in marked limitations in two functional domains. (ECF Doc. 10, pp. 8-11; ECF Doc. 12.)

## VI. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Sole Assignment of Error: Whether ALJ Erred in Finding M.H. Did Not Have Two Marked Limitations, as Needed to Functionally Equal the Listings**

Ms. Robinson argues that the ALJ erred in finding M.H. did not have an impairment or combination of impairments which were functionally equivalent to a listed impairment.  (ECF Doc. 10, pp. 8-11; ECF Doc. 12.)  The Commissioner argues in response that the ALJ's decision was supported by substantial evidence.  (ECF Doc. 11, pp. 7-13.)

To support a determination that M.H.'s impairments functionally equaled the Listings at Step Three of the sequential analysis, the ALJ had to find that the impairments were "of listing-level severity," meaning that they would "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a).  The regulations further provide that the evaluation should include "information from [M.H.'s] parents and teachers, and … from others who see [him] often and can describe [his] functioning at home, in childcare, at school, and in [his] community."  20 C.F.R. § 416.926a(b)(3).

The relevant six domains of functioning are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi).  A "marked limitation" means that a claimant's "impairment(s) interferes seriously with [his] ability to independently initiate, sustain, or complete activities" and "also means a limitation that is 'more than moderate' but 'less than extreme.'"  20 C.F.R. § 416.926a(e)(2)(i).   An "extreme limitation" means that a claimant's "impairment(s) interferes very seriously with [his] ability to independently initiate, sustain, or complete activities" and "also means a limitation that is 'more than marked.'"  20 C.F.R. § 416.926a(e)(3)(i).

Ms. Robinson argues it was unreasonable for the ALJ to find that M.H. had only "less than marked" limitations in the domain of acquiring and using information.  (ECF Doc. 10, p.

9.)[2]  In evaluating that domain, the ALJ was required to consider how well M.H. acquired or

learned information, and how well he used the information he had learned.  *See* 20 C.F.R. §

416.926a(g).  The regulations provide that a school-age-child "should be able to learn to read,

write, and do math, and discuss history and science . . . [and] . . . use these skills in academic

situations to demonstrate what [he] [has] learned."  20 C.F.R. 416.926a(g)(2)(iv).  He "will also

need to use these skills in daily living situations at home and in the community . . . [and] should

be able to use increasingly complex language (vocabulary and grammar) to share information

and ideas with individuals or groups, by asking questions and expressing [his] own ideas, and by

understanding and responding to the opinions of others."  *Id.*

With respect to "acquiring and using information," the ALJ explained:

> The claimant has less than marked limitation in acquiring and using information.
> The record included evidence of school records dated December 4, 2019,
> referencing a parent request for testing for an IEP but no further evidence of a
> meeting, plan, or established IEP[]. A Wechsler Intelligence Scale for Children-V
> (WISC-V) administered on May 14, 2018, showed a Full Scale IQ of 74; however,
> the examiner indicated the claimant put forth variable effort and tested within the
> borderline range of intellectual functioning but estimated to be functioning higher
> within the low average range[]. He answered questions in an age appropriate
> manner and understood simple or one-step instructions and understood complex or
> multi-step instructions[]. A WISC-V administered during a second consultative
> evaluation on July 22, 2020 showed a Full Scale IQ of 45; however, the examiner
> rendered this test invalid given the claimant's minimal effort during testing[]. Other
> examinations indicated the claimant showed logical thought process and no
> abnormal thought content []. Thus, the undersigned finds the claimant has less than
> marked limitation in acquiring and using information.

(Tr. 22 (emphasis in original) (citations omitted).)

Ms. Robinson argues that the ALJ's finding of "less than marked" limitations in

acquiring and using information was not supported by substantial evidence.  (ECF Doc. 10, p. 9.)

---

[2] Ms. Robinson agrees with the ALJ's finding that M.H. had a "marked" limitation in attending and completing tasks, and does not dispute his findings of "less than marked" limitations in interacting and relating with others and ability to care for yourself and "no limitations" in moving about and manipulating objects and health and physical well-being. Only the ALJ's findings as to the "acquiring and using information" domain are addressed herein.

Specifically, she argues "[t]he ALJ appears to focus on M.H.'s I.Q. testing while ignoring other relevant evidence in the file," which she asserts is error because "serious limitations can exist even if the child's I.Q. is normal." (*Id.* at p. 10 (quoting *McQueen v. Comm'r of Soc. Sec.*, 2019 U.S. Dist. LEXIS 228008 (E.D. Mich. Dec. 20, 2019)).) She acknowledges that the ALJ discussed M.H.'s school and treatment records, but argues this was insufficient because the ALJ discussed the records in the context of the domain "attending and completing tasks" without considering that M.H.'s "marked limitations in his ability to attend and complete tasks has seriously impacted [his] ability to acquire and use information." (ECF Doc. 12, p. 1.)

First, Ms. Robinson's argument that the ALJ considered only I.Q. testing in assessing the relevant domain is without merit. His specific discussion of the "acquiring and using information" domain reflects that he also considered:

- the lack of any meeting, plan, or established IEP in the record, despite a request for IEP testing in December 2019 (Tr. 22 (citing Tr. 273-74));

- examination findings indicating M.H. "answered questions in an age appropriate manner and understood simple or one-step instructions and understood complex or multi-step instructions" (Tr. 22 (citing Tr. 245-46, 248)); and

- other clinical examinations noting "logical thought process and no abnormal thought content" (Tr. 22 (citing Tr. 236)).

Indeed, the lack of an IEP was a recurrent theme throughout the record. (Tr. 65, 244, 259, 262, 353.) After reportedly seeking an IEP beginning in 2018, M.H. still did not have one three years later—in early 2021—despite concerns he might have to repeat fourth grade. (Tr. 65, 244, 343.)

The ALJ also considered opinion evidence when "determining the degree of limitation in the [M.H.'s] functioning," including the state agency psychological consultants' opinions. (Tr. 25-26.) He found those opinions persuasive, including their specific findings that M.H. had "less than marked" limitations in acquiring and using information, explaining:

The undersigned finds these opinions persuasive because they are consistent with and supported by the record as whole that included evidence of ADHD symptoms that affect his academic performance and behavior but some improvement and benefit from medication and therapy, for example, needed few redirections and showed age-appropriate social interactions[]. Unremarkable examinations that showed overall good health, appropriate growth and development, no medication side effects, normal physical system functioning, normal mood and affect, and cooperative behavior also support these opinions[]. In addition, the claimant's ability to engage in activities, such as sports, Legos, cars, draw, watch television, play video games, perform some household chores and simple cooking and baking, support these opinions[].

(Tr. 25 (emphasis added) (citations omitted).)  Far from relying on I.Q. testing alone, the ALJ

adopted the opinions of the state agency psychological consultants—each of whom found "less

than marked" limitations in acquiring and using information—after finding those opinions

"supported by the record as a whole."  In doing so, he explicitly acknowledged evidence that

M.H.'s ADHD symptoms affected his academic performance, but also considered evidence that

M.H. showed "some improvement" with medication and therapy, had many unremarkable

examination findings, and engaged in activities that included playing video games, performing

household chores, and simple cooking and baking.  (*Id.*)

As to Ms. Robinson's argument that the ALJ failed to consider whether M.H.'s "marked

limitations in his ability to attend and complete tasks has seriously impacted [his] ability to

acquire and use information" (ECF Doc. 12, p. 1), the ALJ's decision does not support such a

finding.  SSR 09-1p explains that "[a] single impairment, as well as a combination of

impairments, may result in limitations that require evaluation in more than one domain."  SSR

09-1p, 74 Fed. Reg. 7527, 7529 (Feb. 17, 2009).  But an ALJ is not required to discuss all

considerations in SSR 09-1p when determining functional equivalence.  *See Orr ex rel. ADH v.*

*Comm'r of Soc. Sec.*, No. 1:11 CV 192, 2012 WL 4504503, at *4 (N.D. Ohio Sept. 30, 2012);

*see also* 74 Fed. Reg. at 7529.  He need only "provide sufficient detail so that any subsequent reviewers can understand how [he] made [his] findings."  *Orr*, 2012 WL 4504503, at *4.

Here, the ALJ acknowledged the need to evaluate M.H.'s functional equivalence in accordance with SSR 09-1p.  (Tr. 20.)  He evaluated how M.H. performed activities as compared to other children his same age with no impairments (Tr. 20), and he assessed M.H.'s functional equivalence by evaluating how he functioned in each of the six domains (Tr. 21-26).  He specifically acknowledged that M.H.'s ADHD symptoms negatively impacted his academic performance when he adopted two medical opinions finding M.H. had "less than marked" limitations in acquiring and using information.  (Tr. 25.)  He provided sufficient detail to allow this Court the ability to conduct a meaningful review, and the Court finds no merit in the suggestion that the ALJ did not consider whether M.H.'s impairments would "result in limitations that require evaluation in more than one domain."  SSR 09-1p, 74 Fed. Reg. at 7529.

Ms. Robinson also contends that "the record establishes that M.H.'s severe borderline intellectual functioning in combination with his severe ADHD has markedly limited M.H.'s ability to acquire and use information."  (ECF Doc. 10, p. 10.)  More particularly, she asserts that the following evidence demonstrates that M.H. has a marked limitation in acquiring and using information: (1) Dr. Faust's opinions that "M.H. will likely have difficulty learning and retaining new information due to ADH[D] symptoms; he will require more redirection to sustain focus to the task; and will need small segments of information to be able to cognitively process and learn" (*id.* (citing Tr. 248)); (2) evidence indicating that "M.H. repeated the third grade due to difficulty completing school work" (*id.* (citing Tr. 281)); (3) M.H.'s therapist's report "in February 2021, that M.H. ha[d] marked limitations in his ability to carry out very short and simple instructions" (*id.* (citing Tr. 629)); (4) Ms. Robinson's hearing testimony that "M.H. struggle[d] with

24

kindergarten and first grade level books," and was "behind in school and failing classes" (*id*. (citing Tr. 65-66)); and (5) M.H.'s second quarter fourth grade report card showing failing grades in math, English language arts, science, and social studies (*id*. (citing Tr. 221).)  But a review of the ALJ decision reveals that he considered the evidence in question, and Ms. Robinson has not shown that the ALJ's findings lacked the support of substantial evidence.

First, the ALJ did consider Dr. Faust's psychological evaluation and opinion.  Although he did not specifically discuss Dr. Faust's observation that M.H. would "need small segments of information to be able to cognitively process and learn" (Tr. 248), he did observe that Dr. Faust found M.H. "struggle[d] with learning in the classroom related to attention deficits and associated disruptive behaviors," would "have difficulty sustaining attention for long periods," and would "require redirection from adults in a group setting to complete assigned tasks."  (Tr. 25.)  The ALJ was not required discuss every piece of evidence to render a decision supported by substantial evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  Here, the ALJ accurately characterized Dr. Faust's findings but found the opinion "less persuasive" because it was based on a May 2018 examination, 1.5 years before the disability period in question.  (Tr. 25.)  Ms. Robinson has failed to show that Dr. Faust's opinion required the ALJ to find M.H. had a marked limitation in acquiring or using information.[3]

Second, the ALJ considered evidence showing M.H. "repeated the third grade due to difficulty completing his work."  (Tr. 22.)  Although the ALJ's citation to this evidence is contained in the analysis of "attending and completing tasks," Ms. Robinson has not shown that M.H. was required to repeat third grade because of his inability to acquire or use information.

---

[3] Ms. Robinson has not made a direct, developed, or clearly articulated challenge to the finding that this opinion was "less persuasive"; any such challenge is waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997).

For instance, Ms. Robinson told Dr. Faust in 2018 that M.H. did his homework but did not turn it in. (Tr. 244.) In 2019, Ms. Robinson expressed concern that M.H. might have to repeat third grade, but reported that his teachers told her he was refusing to do his work. (Tr. 264.) His 2020-21 report card reflected all Fs, but also reflected that he had missing assignments in most classes and "d[id] not attend class or complete assignments." (Tr. 221.) The ALJ considered the lack of an established IEP and clinical examination findings that were consistent with low average intellectual functioning. (Tr. 22.) Thus, Ms. Robinson has failed to show that M.H.'s retention in third grade proved he had marked limitations in acquiring and using information.

Third, the ALJ considered the February 2021 opinion of M.H.'s therapist, but found it "unpersuasive because it concerns the claimant's ability to sustain functioning in an eight-hour workday as an adult and does not provide an opinion regarding functional limitations as a child applicable to his child disability claim."[4] (Tr. 26.) Ms. Robinson argues that the therapist's observation that "M.H. ha[d] marked limitations in his ability to carry out very short and simple instructions" supports a finding that M.H. had marked limitations in acquiring and using information. (ECF Doc. 10, p. 10.) But Ms. Gardner did not opine that M.H. was markedly limited in all areas that might bear on the domain of "acquiring or using information." For instance, she opined that he was not significantly limited in his ability to remember work-like procedures and was moderately limited in his ability to understand and remember very short and simple instructions. (Tr. 629.) And while she noted that his symptoms impacted his academic performance, she also observed that he was continuing to learn coping skills. (Tr. 630.) As discussed above, the ALJ explained why he found Ms. Gardner's opinion unpersuasive and was not required to account for every piece of evidence in support of his findings. Ms. Robinson has

---

[4] Ms. Robinson has not made a direct, developed, or clearly articulated challenge to the ALJ's weighing of this opinion, and any such challenge is waived. *McPherson*, 125 F.3d at 995–96.

26

failed to demonstrate that Ms. Gardner's opinion required the ALJ to find that M.H. had a marked limitation in acquiring or using information.

Fourth, Ms. Robinson argues that her own testimony that "M.H. struggle[d] with kindergarten and first grade level books" and was "behind in school and failing classes" supports a marked limitation in acquiring and using information.  (ECF Doc. 10, p. 10 (citing Tr. 65-66).)  But the ALJ considered Ms. Robinson's subjective reports regarding difficulties in school and acknowledged her reports that M.H.'s impairments affected his ability to "progress in learning, including reading, understanding, and spelling."  (Tr. 21.)  He nevertheless found that "the allegations concerning the intensity, persistence and limiting effects of [M.H's] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record."  (*Id*.)  Rather than ignoring reports of reading deficiencies or failing grades, the ALJ noted the absence of IEP or other intervention records, normal clinical examination findings, and findings that low scores on cognitive testing were unreliable.  (Tr. 22.)  The ALJ was not required to find marked limitations in acquiring and using information based on subjective allegations alone.[5]

Finally, the ALJ considered M.H.'s second quarter fourth grade report card, which showed failing grades.  (Tr. 22.)  As with the evidence showing that M.H. had to repeat third grade, the ALJ specifically discussed the evidence regarding the failing grades when explaining that M.H. had marked limitations in attending and completing tasks.  (*Id*.)  The comments on the second quarter fourth-grade report card support the ALJ's consideration of this evidence for that purpose.  The report card reflects that M.H. had "missing assignments" and did "not attend class or complete assignments."  (Tr. 221.)  With respect to the F in Mathematics, the teacher commented that M.H. needed to practice his multiplication facts every day.  (*Id*.)  While the

---

[5] Ms. Robinson does not raise a specific challenge to the ALJ's evaluation of her subjective allegations, and any such challenge is waived.  *McPherson*, 125 F.3d at 995–96.

evidence reflects that M.H. was failing his core subjects in fourth grade, there was no IEP in place and there is no indication on the report card that the Fs were related to an inability to acquire or use information.  Based on this record, Ms. Robinson has not shown that this evidence required the ALJ to find a marked limitation in acquiring and using information.

Ms. Robinson has not identified material evidence that the ALJ failed to consider in assessing the "acquiring and using information" domain and has not shown that the ALJ mischaracterized the evidence.  She argues that the evidence supports a finding that M.H. has marked limitations in acquiring and using information (ECF Doc. 10, p. 10), but that is not the question before this Court.  Even if a preponderance of the evidence supported "marked limitations" in that domain, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  To second-guess the ALJ's finding would interfere with the recognized "'zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).

Here, the ALJ considered the totality of the records, including the evidence highlighted in Ms. Robinson's brief.  He did not ignore M.H.'s academic struggles.  Instead, he found the record supported "less than marked" limitations in the ability to acquire and use information. (Tr. 22.)  Having reviewed the ALJ decision and the evidentiary record, the Court finds substantial evidence supported that finding.  The Court further finds that the ALJ sufficiently considered the evidence and provided "an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.  Accordingly, the Court must conclude that Ms. Robinson has failed to meet her burden and her assignment of error is without merit.

### VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the final decision of the Commissioner.

October 23, 2023

/s/ Amanda M. Knapp

AMANDA M. KNAPP
United States Magistrate Judge